**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **DANIEL BRYAN KELLEY,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **Case No. 20-CV-0635-GKF-JFJ** |
| | ) |
| **CARRIE BRIDGES, Warden,[1]** | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Petitioner Daniel Bryan Kelley, a self-represented Oklahoma prisoner,[2] brings this federal habeas action to challenge his custody under the judgment entered against him in Tulsa County District Court Case No. CF-2015-694. He primarily claims his appellate attorney provided constitutionally ineffective assistance by failing to advise him about the potential adverse consequences of raising a sentencing-error claim on direct appeal—specifically, the risk that the appellate court could remand the case for resentencing thereby exposing Kelley to a longer sentence. Kelley also claims the state district court erroneously instructed his resentencing jury regarding the range of punishment and the state district court should have allowed him to refuse the remedy of resentencing. Having considered Kelley's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") (Dkt. 1), Respondent's Response in

---

[1] Kelley is incarcerated at the James Crabtree Correctional Center ("JCCC"), in Helena, Oklahoma. The Court therefore substitutes the JCCC's current warden, Carrie Bridges, in place of Rick Whitten as party respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note on the record this substitution.

[2] Because Kelley appears without counsel, the Court liberally construes his pleadings but will not act as his advocate. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Opposition to the Petition ("Response") (Dkt. 12), the record of state court proceedings (Dkts. 12-1 through 12-16, 13, 14), and applicable law, the Court denies the Petition.

## BACKGROUND

### I.   Jury trial

In 2015, a jury found Kelley guilty of First-Degree Rape by Instrumentation, in violation of Okla. Stat. tit. 21, § 1114(A)(6), and Assault and Battery, in violation of Okla. Stat. tit. 21, § 644. Dkt. 12-3, at 1; Dkt. 13-5, at 90-91.[3] The State presented evidence at trial establishing that Kelley, Richard Putz, and J.W.[4]—the latter two of whom were homeless—were drinking alcohol in Kelley's second-floor apartment, near the Salvation Army shelter and the Day Center for the Homeless. Dkt. 13-4, at 40, 83-88. Kelley was "trying to call a girlfriend somebody," he became agitated when he received no answer and no return phone calls, and he continued drinking "brown liquor." *Id.* at 86-88, 97-98. When Putz told Kelley to calm down, Kelley punched and kicked Putz, causing injuries to his face and head. *Id.* at 47-50, 56, 71, 88-89. J.W. used wipes from her backpack to clean Putz's injuries and suggested to Kelley that Putz needed emergency medical care. *Id.* at 89. Kelley disagreed stating, "Fuck Richard." *Id.* At some point, Kelley slumped over in his office chair, presumably from the effects of alcohol. *Id.* at 90.

J.W., who suffered from neuropathy and had limited use of her legs, left Kelley's apartment by pushing her empty wheelchair down the stairway, sitting down on the top step, and scooting herself down each step. Dkt. 13-4, at 83-84, 90, 103. After J.W. made it to the bottom of the

---

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

[4] J.W., the adult female Kelley raped, testified at Kelley's preliminary hearing but died before his trial. Dkt. 12, at 4. Her death was not related to the rape. Dkt. 13-2, at 6. Several facts in this section are drawn from J.W.'s preliminary hearing testimony which the State presented at trial.

stairway but before she got into her wheelchair, Kelley came outside. *Id.* at 91, 100-05. Kelley asked J.W. where she was going, and she told him she was leaving. *Id.* at 91. Kelley said, "No, you're not," walked to the bottom of the stairs, "yanked" or grabbed J.W., and pulled down her pants. *Id.* at 91-92, 104-05. Kelley stood over J.W., who was lying on her back on the ground, and stated, "I didn't get it from her. I'm going to get it from you, and I'm not leaving any evidence." *Id.* at 92-93, 103-05. Kelley then used an empty beer bottle to forcibly penetrate J.W.'s vagina, moved the bottle "like you would if it was a penis in the vagina," then threw the bottle on the ground. *Id.* at 93-95. Kelley left J.W. on the ground and returned to his apartment. *Id.* at 95.

J.W. got into her wheelchair, wheeled herself to a fast-food restaurant approximately one mile away from Kelley's apartment, and called 911. Dkt. 13-4, at 67-68, 95-96, 141-42. J.W. told the responding emergency medical technician that Kelley raped her with a beer bottle, causing her to bleed, and that Kelley assaulted and injured Putz. *Id.* at 142-48. J.W. was transported to the hospital for a sexual assault examination. *Id.* at 148. During the examination, J.W. told the nurse, Kathy Bell, that Kelley "beat up" J.W.'s friend, and that Kelley pulled off J.W.'s pants and "masturbated while he inserted a bottle into [her] vagina." *Id.* at 152-54, 169-70, 186. J.W. also told Bell that she had neuropathy, she was anemic, and she had not had a menstrual period for at least three years. *Id.* at 171-72. Bell examined J.W.'s vagina with a colposcope—a magnifying camera—and observed blood and a vaginal tear. *Id.* at 171-73, 193-96, 206. Bell testified that a vaginal tear is caused by blunt force trauma, that internal vaginal tears are rare and not "usually" caused by insertion of a penis, and that J.W.'s vaginal tear was consistent with forcible penetration of the vagina with a bottle. *Id.* at 177-79, 195-96.

During the sentencing phase of Kelley's trial,[5] the prosecutor presented evidence that Kelley had two prior felony convictions, including one out-of-state conviction.  Dkt. 13-5, at 97-98.  To prove that conviction, the State introduced State's Exhibit 25, showing that Kelley had a prior Kansas conviction for Aggravated Assault and Battery, in violation of Kan. Stat. Ann. § 21-3414(a)(1)(C).  *Id.*; Dkt. 12-3, at 8-9.  The trial court instructed the jury that First-Degree Rape by Instrumentation after former conviction of two felonies was punishable by a range of twenty years to life in prison, with or without parole, and a fine not exceeding $10,000.  Dkt. 13-14, at 120-21.  The trial court further instructed the jury that First-Degree Rape by Instrumentation after former conviction of one felony was punishable by a range of ten years to life in prison, with or without parole, and a fine not exceeding $10,000.  *Id.* at 121.  The jury found that Kelley had two prior felony convictions and recommended twenty years' imprisonment and a $5,000 fine as to the rape conviction.  *Id.* at 127.  Kelley waived his right to a presentence investigation and requested immediate sentencing.  Dkt. 13-5, at 108-09.  The trial court sentenced Kelley to twenty years' imprisonment as to the rape conviction, imposed a 90-day jail sentence as to the assault and battery conviction, and ordered the jail sentence to be served concurrently with the prison sentence.  *Id.* at 109-11; Dkt. 12-3, at 1.[6]

## II.    Direct appeal

Represented by counsel, Kelley filed a direct appeal in the Oklahoma Court of Criminal

---

[5] Oklahoma law provides for a bifurcated jury trial in a noncapital case when the State, as it did in Kelley's case, alleges the defendant committed a crime after former conviction of one or more felonies.  Dkt. 13-5, at 93-95; Okla. Stat. tit. 22, § 860.1.

[6] During the trial, the trial court found that Kelley committed the crimes for which he was convicted while he was serving a three-year suspended sentence in Tulsa County District Court Case No. CF-2013-4187, revoked his suspended sentence in full, and ordered that the three-year prison sentence, with credit for time already served, be served concurrently with the twenty-year prison sentence.  Dkt. 13-4, at 114, 133-36; Dkt. 13-5, at 111.

Appeals ("OCCA"), Case No. F-2015-963, raising seven claims.[7]  Dkt. 12-1.  Kelley claimed: (1) the trial court violated the Confrontation Clause and deprived him of a fair trial by refusing to permit defense counsel to present evidence; (2) the trial court violated state law and the Confrontation Clause by admitting an "overwhelming amount" of hearsay; (3) the trial court erroneously admitted a detective's testimony quoting hearsay statements of an unavailable witness; (4) the trial court erroneously admitted the "judgment and sentence from Kansas in the second stage of [Kelley's] jury trial"; (5) the prosecutor deprived him of a fair trial by committing reversible misconduct; (6) his trial counsel provided constitutionally ineffective assistance; and (7) the cumulative effect of errors deprived him of a fair trial.  Dkt. 12-1, at 2-3.

The OCCA rejected claims one through three and five through seven and affirmed Kelley's convictions.  Dkt. 12-3, at 1, 3-8, 12-14.  The OCCA granted relief as to claim four.  *Id.* at 8-11. Applying Oklahoma law, the OCCA found that the State did not establish that "his Kansas conviction constituted a felony under Oklahoma law at the time it was committed."  *Id.*  The OCCA thus concluded that "plain error occurred when State's Exhibit 25 was erroneously admitted into evidence and used to enhance [Kelley's] punishment for his [rape] conviction."  *Id.* at 11.  The OCCA acknowledged Kelley's request, in his appellate brief, that the OCCA "modify his sentence to ten (10) years," i.e., the minimum sentence the jury could have imposed if it found he had only one prior felony conviction, but the OCCA chose instead to remand the case for resentencing.  *Id.*

---

[7] Kelley's trial counsel, Velia Lopez, filed Kelley's notice of intent to appeal, and the trial court appointed the Tulsa County Public Defender's Office to represent Kelley on appeal.  Dkt. 13-14, at 134-39.  In October 2015, Nicole Herron, an appellate attorney with that office, sent Kelley a letter introducing herself as Kelley's appointed counsel and generally describing the appeal process.  Dkt. 13-13, at 112-13.  In January 2016, Richard Couch, an appellate attorney with that same office, filed Kelley's petition in error, sent Kelley a second letter describing the appeal process, and enclosed with that letter a copy of the petition in error.  *Id.* at 111.  In June 2016, Stuart Southerland, an appellate attorney with that same office, filed Kelley's direct appeal brief and certified in the brief that a copy of the brief was mailed to Kelley.  Dkt. 12-1, at 1, 38.

at 11, 14; *see* Okla. Stat. tit. 22, § 929(A) (2017) ("Upon any appeal of a conviction by the defendant in a noncapital criminal case, the appellate court, if it finds prejudicial error in the sentencing proceeding only, may set aside the sentence rendered and remand the case to the trial court in the jurisdiction in which the defendant was originally sentenced for resentencing."); Okla. Stat. tit. 22, § 1066 (2017) ("The appellate court may reverse, affirm or modify the judgment or sentence appealed from, and may, if necessary or proper, order a new trial or resentencing.").

One day after the OCCA issued its decision, Stuart Southerland mailed a letter to Kelley, notifying Kelley of the decision, enclosing a copy of the decision, and informing Kelley that because the OCCA remanded the case for resentencing, "either the judge or the jury will be able to sentence you within a range of ten to life" and Kelley could get a sentence exceeding his original twenty-year prison sentence.  Dkt. 13-13, at 48, 52, 104.  In the letter, Southerland also suggested that it might be possible to make an agreement with the prosecutor for a modified sentence between ten and twenty years.  *Id.* at 104.  That same day, the prosecutor filed a written request asking the state district court to impanel a new sentencing jury.  Dkt. 13-14, at 166-67; *see* Okla. Stat. tit. 22, § 929(B) (2017) ("When a criminal case is remanded for vacation of a sentence, the court may . . . [i]f the defendant or the prosecutor so requests in writing, impanel a new sentencing jury."); Okla. Stat. tit. 22, § 929(C) (2017) ("If a written request for a jury trial is filed within twenty (20) days of the date of the appellate court order, the trial court shall impanel a new jury for the purpose of conducting a new sentencing proceeding.").  The prosecutor also moved for leave to admit additional evidence at the resentencing trial so the State could seek an enhanced sentence by establishing that Kelley's Kansas conviction qualifies as a felony under Oklahoma law.  Dkt. 13-15, at 3-11.

Sometime after Southerland sent the letter to Kelley, Southerland and Kelley spoke on the

phone and discussed the risks of a resentencing trial—including the risk that he could receive a longer sentence—and the possibility of dismissing his direct appeal.  Dkt. 13-13, at 32-33, 37-40, 52-53.  Thereafter, on August 1, 2017, Southerland filed a petition for rehearing in the OCCA, citing Rule 3.14(B)(1), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2017).  Dkt. 12-4.  Southerland asserted that, under the facts of Kelley's case, "it is unfair to require [Kelley] to endure a resentencing trial when he requested [sentencing] modification," and that the OCCA's "decision to remand for resentencing is inconsistent with other decisions from [the OCCA] and will have a chilling effect on the assertion of the right to appeal for similarly situated persons." *Id.* at 1.  Southerland also argued that the State should not be permitted a second opportunity, at the resentencing trial, to seek an enhanced sentence based on the Kansas conviction. *Id.* at 2-4, 7-9.  In the conclusion paragraph of the petition for rehearing, Southerland stated,

> [Kelley] is not asking for [the OCCA] to dismiss this appeal.  Mr. Kelley has expressed to the undersigned his willingness to take the risk of a life sentence as long as he has the ability to argue to a second jury for a term shorter than the 20-year sentence he has already received.

*Id.* at 9.  Southerland nonetheless argued that Kelley "should not have to" face resentencing and asked the OCCA to modify Kelley's sentence to "the minimum of 10 years . . . in accordance with the lenient intentions of the first jury in this case." *Id.*  The OCCA denied the petition for rehearing on September 5, 2017, concluding that the "petition fail[ed] to state a valid basis for rehearing under" Rule 3.14(B).[8]  Dkt. 12-5, at 1.  The OCCA reasoned that it did not overlook any issues, that it applied the law to the facts of the case, including when it decided to remand the case for

---

[8] Rule 3.14(B) provides that a petition for rehearing may be filed only for two reasons: "(1) Some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or (2) The decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument." Rule 3.14(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2017).

resentencing rather than modify the sentence, and that it was implicit in its decision that the State would not have a second chance at the resentencing trial to present evidence regarding the Kansas conviction. *Id.* at 1-2.

## III.   Resentencing trial

Tulsa County District Judge Sharon Holmes presided over Kelley's resentencing trial in December 2017.  Dkt. 13-8.  Southerland represented Kelley at the resentencing trial and, before jury selection began, Southerland objected to the resentencing trial, stating:

> Judge, I just want to make a very brief record.  I did this appeal.  When I did the appeal, I pointed out this [sentencing] error to the [OCCA], and the [OCCA] agreed with me.  What they disagreed with me on was the remedy.  I asked for modification of the sentence, which clearly would have created an uppermost range of 20 years.  The range—now the correct range is 10 to life, and I was asking that they modify to—actually, I think I asked for 10, but I was expecting modification to some term of years between 10 and 20.  They ignored my request and sent this case back for resentencing.  I filed sort of an objection with my petition for rehearing, but they pointed out that was the improper way to do that, that that's not an argument that can be raise[d] on a petition for rehearing.  So I'm raising it now, simply objecting to the relief granted by the [OCCA].

Dkt. 13-8, at 15-16.  The trial court permitted Southerland to make this record but proceeded with the resentencing trial over his objection.  *Id.*

After the jury was sworn in, the trial court instructed the jury that Kelley had already been found guilty of First-Degree Rape by Instrumentation, and that the jury's task was to determine punishment.  Dkt. 13-9, at 107.  The State presented most, but not all, of the evidence it presented at Kelley's original trial.  *Id.* at 107-87; *see also id.* at 192 (describing exhibits that were not admitted at the resentencing trial).  The State also presented evidence showing that Kelley had one prior felony conviction for assault with a dangerous weapon.  *Id.* at 187.  During the jury instructions conference, Southerland requested an instruction informing the jury that the permissible sentencing range is ten years to twenty years in prison.  Dkt. 13-10, at 7.  In support of this request, Southerland argued, in part:

> I didn't ask for a resentencing in this case; [the OCCA] gave me a resentencing. And I just think it's unfair. It's a violation of due process, my client's right to have his trial tried in a single proceeding, to kind of force him to run that gauntlet again. The last jury gave him 20. I realize that we can't go back and give the case to that jury again, but by giving it to a second jury, which may very well not be as lenient as that other jury, we're putting him in a position, really, I think where he could potentially be punished as a result of having the jury improperly instructed the first time. And I just think that's inherently unfair.

*Id.* The trial court denied Kelley's request, reasoning that "essentially what you're doing is coming up with your own range of punishment," and declining "to be the first judge who changes the law from the bench with regard to at least that issue." *Id.* at 8. Before closing arguments, the trial court instructed the resentencing jury that the permissible sentencing range was ten years to life in prison, with or without parole, and a fine not exceeding $10,000. *Id.* at 13; Dkt. 13-15, at 144. The resentencing jury recommended a sentence of life imprisonment with the possibility of parole and no fine. Dkt. 13-15, at 148; Dkt 13-10, at 32.

During the resentencing hearing, the prosecutor urged the trial court to follow the jury's recommendation. Dkt. 13-12, at 2. Southerland reminded the trial court that he had "objected to this [resentencing] proceeding from the very beginning." *Id.* at 3. Southerland argued that the remand for resentencing violated "double jeopardy under both the United States and the state constitution[s]," "violated due process in that Mr. Kelley was not given an opportunity . . . to essentially refuse [the remedy of resentencing] and just basically drop the appeal," and violated Kelley's constitutional right to the effective assistance of appellate counsel. *Id.* at 9-10. As to this last point, Southerland stated, "I never—I didn't tell him up front that this could happen. I told him the relief that we were requesting and I didn't advise him that the [OCCA] could remand it for a new sentencing trial, because that was not requested." *Id.* at 10. The trial court acknowledged Southerland's arguments but reasoned that it was not in any position to question the OCCA's decision to remand the case for resentencing instead of modifying his sentence. *Id.* at 6-10.

Ultimately, the trial court imposed the life sentence recommended by the resentencing jury. *Id.* at 13.

## IV.   Resentencing appeal and evidentiary hearing

Represented by Nicole Herron, Kelley filed a resentencing appeal in the OCCA, Case No. F-2018-12. Dkt. 12-6. Kelley claimed (1) Southerland provided constitutionally ineffective assistance on direct appeal by failing to "advise him of the potential adverse consequences of appealing his conviction and sentence"; (2) the trial court abused its discretion by failing to instruct the resentencing jury that the range of punishment was ten to twenty years in prison; (3) the trial court abused its discretion by not permitting him to reject the remedy of resentencing that the OCCA granted him on direct appeal; and (4) his life sentence is excessive and should be modified. *Id.* at 2-3. Kelley suggested the appropriate remedy as to each claim would be for the OCCA to modify his life sentence to the twenty-year prison sentence imposed by the original jury. *Id.* at 14, 21, 23, 25. Kelley also requested an evidentiary hearing as to his ineffective-assistance-of-appellate-counsel claim and submitted affidavits from himself, Herron, and Southerland in support of his request. Dkt. 12-7. The OCCA found that "Kelley's application and supporting affidavits contain assertions of fact that, if proven, strongly suggest that appellate counsel rendered ineffective assistance of counsel," granted Kelley's motion, and remanded the case to the state district court for an evidentiary hearing. Dkt. 12-10, at 5-6. The OCCA expressly instructed the state district court to

> hear evidence and enter findings of fact and conclusions of law addressing the following issues:
>
> (1)   Whether, or to what extent, appellate counsel discussed with Kelley the issues raised in his direct appeal brief prior to, and post, filing, with a focus on any discussion related to the potential adverse consequences of successfully appealing his conviction and sentence, including dates and circumstances of any conversation(s);

10

(2)     Whether or not appellate counsel advised Kelley that the Court of Criminal Appeals could deny his request for sentence modification on his sentencing error and instead order resentencing;

(3)     Whether or not appellate counsel advised Kelley he could receive a life sentence if he appealed his 20-year sentence and prevailed only on his sentencing error claim;

(4)     If not, whether Kelley would have waived presentation of his sentencing error claim or accepted the risk of a longer sentence had he been properly warned of his exposure of a longer sentence; and

(5)     Whether appellate counsel was ineffective.

Dkt. 12-10, at 5-6.

Tulsa County District Judge William Musseman, the same judge who presided over Kelley's original trial, held an evidentiary hearing in May 2019.  Dkt. 12-11; Dkt. 13-2.  Herron represented Kelley at the hearing, and Randall Young represented the State.  Dkt. 13-13, at 1. Herron presented testimony from Andrea Miller, Southerland, and Kelley.  *Id.* at 1-2.

Miller, the head of the appellate division of the Oklahoma Public Defender's Office, testified about her office's longstanding unwritten policy to advise clients of "the possible adverse consequences of prevailing on appeal" and about letters she had written to clients in the past advising them to consider the risks of raising certain issues on appeal and asking the clients if they want to proceed with the appeal despite the risks.  *Id.* at 10-19, 21, 106-10.  Miller testified that if a client does not respond to a letter and appellate counsel "believe[s] it is a meritorious issue that has to be raised, [counsel will] go ahead and raise it" but will continue to try to contact the client and, if possible, will seek dismissal of the issue or the appeal if the client does not want to proceed. *Id.* at 16.  Miller testified that she rarely requests sentencing modification as a remedy because the OCCA "rarely modifies a sentence" and "it makes more sense to advocate for a new sentencing proceeding and then hope that if the [OCCA] is willing to do something they'll modify, because the [OCCA] can - - the remedy the [OCCA] determines isn't limited to what [clients] ask for

necessarily." *Id.* at 19-22.  Miller testified she ordinarily does not discuss appellate remedies with

a client, but she instead focuses on discussing "the consequences of appeal" if the client could be

placed in a worse position by taking an appeal.  *Id.* at 20, 23.

Kelley testified that after his original trial he did not understand the appeal process and that

his trial counsel, Velia Lopez, "mentioned that she was going to file an intent" or "[a] notice of

intent."  *Id.* at 30.  Kelley testified the contact he had with the Tulsa County Public Defender's

Office before his direct appeal was filed and decided was "little to none."  *Id.* at 31.  The following

colloquy then occurred between Herron and Kelley:

Q.    . . . before your first appeal was filed and decided, did Mr. Southerland ever
talk to you about what issues he was going to raise in your appeal?

A.    I don't believe so.

Q.    And again, still talking about before the appeal was filed, did you ever see
a copy of your brief?

A.    No, I did not.

Q.    And again, before your first appeal was filed and decided, what was your
understanding of what could happen to you if you won your appeal?

A.    I guess, my logic, in my mind, was an assumption that it would fall between
the 10- and 20-year parameters.

Q.    Why did you think that?

A.    I don't have any idea.  Just my logic, I guess.

Q.    Okay.  I want to talk to you now about what happened after your first appeal
was filed and decided.  Okay?  How did you find out that you had won your
appeal?

A.    I received a letter in the mail telling me congratulations, and the other
content to that I don't recall.

Q.    Is that all you remember about that letter you received?

A.    That's all I can recall at this time.

Q.    And after receiving the letter, did you have contact with Mr. Southerland by

12

a phone call?

A.      I did.

. . .

Q.      Okay.  And during that phone call, did you and Mr. Southerland discuss what happened with your appeal?

A.      We did discuss it and I'm not sure that I understood everything that was going on.

Q.      Okay.  At that time did you understand that you could face up to life in prison in a new sentencing trial?

A.      I did understand that I could face life.

Q.      Is that the first time that you understood that?

A.      That's the very first time that that was brought to my attention.

Q.      Okay.  And during that same phone call, did you tell Mr. Southerland that you wanted him to find out if he could dismiss your appeal?

A.      I absolutely did.

Q.      Was it your understanding that's what he was going to do?

A.      That was my understanding.  And from that point forward, I was waiting for another phone call or a letter in the mail or some kind of contact.

Q.      Okay.  Did you ever tell Mr. Southerland that you wanted to risk a life sentence as long as you had the ability to argue to a second jury a term shorter than the 20-year sentence you had already received?

A.      No, I did not.

. . .

Q.      Okay.  So now I want to talk about what happened whenever you came back to Tulsa County for your second trial.  Okay?

A.      Yes.

Q.      Do you remember meeting with Mr. Southerland at that time?

A.      Yes, I did.

Q.      Okay.  And at that time did you tell Mr. Southerland you wanted to pull the

13

> appeal and keep the 20?
>
> A.   Yes, I did.
>
> Q.   What did Mr. Southerland tell you?
>
> A.   He said that it was not possible or it was no longer possible.  I don't recall which.
>
> Q.   And if you knew back then what you know now about the legal and appellate process, would you have ever consented to Mr. Southerland raising an issue that would risk a new sentencing trial?
>
> A.   Absolutely not.

Dkt. 13-13, at 31-34.

On cross-examination, Kelley testified that the only correspondence he recalled receiving about his direct appeal was the letter from Southerland "that had the congratulations on the front page." Dkt. 13-13, at 34-37.  Kelley testified as follows regarding his recall of the contents of that letter and his phone conversation with Southerland:

> Q.   I want to talk with you for a moment about the phone call that you had with Mr. Southerland.  You had already received the letter congratulating you on your appeal, correct?
>
> A.   Yes.
>
> Q.   Do you remember in that letter Mr. Southerland told you that there is some risk to resentencing?
>
> A.   I don't recall that.
>
> Q.   Do you remember that in the July 14th letter Mr. Southerland told you that as unfair as it sounds, you could get more than 20 years than [sic] you've already been sentenced to?
>
> A.   I don't remember that.
>
> Q.   Do you remember discussing that letter with Mr. Southerland over the phone?
>
> A.   I remember having a phone conversation with him, but I don't - - I don't remember what letter or what paperwork I had in front of me at the time.

Q.     Did you remember receiving that letter dated July 14, 2017?

A.     I don't recall it at this time.

Q.     Did you recall receiving any correspondence from Mr. Southerland telling you about the risks of resentencing after the [OCCA] had decided you would be resentenced?

A.     Yes, I do.

Q.     Did you discuss that with Mr. Southerland over the phone?

A.     I did discuss it with him over the phone.

Q.     Did he offer to dismiss the appeal for you?

A.     He said he would try to dismiss it and he didn't know whether he could or not, be he was going to go ahead and file something or do something.

Q.     Did he talk to you about the risks of resentencing?

A.     At that time?

Q.     On the phone, yes.

A.     I believe so.

Q.     Do you remember him - - did he talk with you about the possible benefits of resentencing?

A.     I don't remember there being anything discussed about benefits.

Q.     Did he tell you that you could receive less than 20 years on resentencing?

A.     I suppose that he may have.  There was a lot of noise in the hallway and I've got tinnitus and my ears ring a lot.  I thought I understood everything that he was telling me.

Q.     So it's your testimony that he offered to dismiss the appeal for you?

A.     He offered to try.

Q.     Did you ask him to dismiss the appeal?

A.     I asked him to.

Q.     At any point did Mr. Southerland speak with you about what he thought the State of Oklahoma, what the District Attorney's Office was going to seek on resentencing?

A.       I don't believe so.

Q.       He didn't tell you what sentence the State was going to try and seek?

A.       I don't believe so.

Q.       At any point were you aware that the State was going to seek a jury trial for resentencing?

A.       No.

Q.       Mr. Southerland met with you at [the Tulsa County Jail], right?

A.       Yes.

Q.       And you guys talked about the upcoming resentencing trial, correct?

A.       Yes.

Q.       What did he tell you?

A.       First I asked him if it was possible to - - basically to stop the train, is there any way to stop this from going forward.  And he said that he had filed something and hadn't heard anything back.  He didn't think so.  It was going to go forward.

Q.       Did he tell you at that time what sentence the State was going to seek?

A.       It's very possible he did.

Dkt. 13-13, at 37-40.

Southerland testified that he had no contact with Kelley before the OCCA issued its decision regarding Kelley's direct appeal.  Dkt. 13-13, at 43-44.  Southerland identified two introductory letters that were sent to Kelley about his direct appeal and testified that a paralegal in his office produces and sends these letters explaining the appeal process in general terms.  *Id.* at 43-45.  Southerland testified that he did not communicate with Kelley about any issues that would be raised in the brief before he filed the brief.  *Id.* at 46.  Southerland also testified that he personally did not send a copy of the brief to Kelley, and that his paralegal ordinarily sends a copy of an appellate brief to the appellant when it is filed in the OCCA.  *Id.* at 46-47.  Regarding the

sentencing-error claim, Southerland testified:

Q.      Okay.  And in one of the propositions in the brief, you ask for modification instead of resentencing; is that right?

A.      I did, the fourth proposition of error.

Q.      And why did you do that?

A.      Well, I was aware that the first jury had imposed a minimal sentence, based on the way they were instructed, 20 years to life.  It was my understanding that if I had asked for sentencing - - resentencing, that they would be open to the entire range of punishment, which if I was correct, in my allegation of error, would have been 20 - - or I'm sorry - - 10 years, up to life.  I believe that, you know, in an upside-downside risk evaluation that modification was the better choice of action.  It limited the client's risk.

Q.      Were you aware that the [OCCA] instead of modifying could send it back for resentencing?

A.      I knew that was within their statutory powers, yes.

Q.      So after receiving the opinion from the [OCCA] remanding for resentencing, did you have a conversation with [Kelley]?

A.      Not immediately.  The first thing I did was write him a letter.

Q.      And what was the first time you told [Kelley] about the possibility of getting a longer sentence on resentencing?

A.      It would have been in that letter which was one day I think after the appeal.  The appeal was decided I believe on July 13th of 2017 and I wrote him a letter on July 14th.  Contained within that letter was a lot of information, but there was, I recall, one sentence pertaining to his exposure to up to life.

Q.      And at that time did you believe that it was in his best interests to proceed with a resentencing trial?

A.      I did not.

Q.      Did you at any point become aware that [Kelley] in fact did not want a new sentencing trial?

A.      I did.

Q.      And when did you become aware?

A.      I was looking at the docket sheet.  I am not sure exactly how he got back to

17

Tulsa County.  I did not file a writ.  But when I became aware that he had been brought back to Tulsa County for the resentencing trial, I went to visit him, and that's when we had the discussion where he indicated to me that now that he understood the risk, he did not want to pursue a resentencing trial.

Q.    What was your advice to him on whether he should try to waive his resentencing trial or proceed with the risk of an increased sentence?

A.    We discussed - - my initial conversation with him was sort of based on the fact that because the State had filed a request for jury trial, I wasn't sure that there was anything that we could do to stop that process.  I told him that with his consent that I would object to the resentencing proceeding and I did so.

Q.    You did object to the resentencing proceeding?

A.    I did, before the trial.

Q.    And when you objected, what happened?

A.    Nothing.  Judge Holmes was doing the resentencing trial and she overruled my objection and the case proceeded to resentencing.

Q.    So at that time you understood [Kelley] did not want to proceed to trial?

A.    Absolutely.

Q.    But because the State filed a motion for new sentencing trial, there was nothing you could to do stop it?

A.    My impression of the law is that, once that happens, because the State has a right to a resentencing jury trial, that it was out of our hands, there was nothing we could do to stop it.  It's different than a normal case where you could plea.  There was nothing to plea to at that point.  So we couldn't waive it and enter a plea.  We had to move forward.

Dkt. 13-13, at 47-50.  After the state district court asked Southerland questions about the petition for rehearing that he filed, the following colloquy occurred between Herron and Southerland:

Q.    (BY MS. HERRON) Mr. Southerland, at the conclusion of the petition for rehearing, you stated that you had talked to Mr. Kelley and he expressed his willingness to take the risk of a life sentence as long as he had the ability to argue to a second jury a term shorter than 20 years.  Do you remember that?

A.    I do.

18

Q.      And did you eventually come to realize that [Kelley] had a hard time understanding what was going on?

A.      When he was brought back, that was the only conversation that I had ever had with him at that point.  It was a phone call that I made down in the jail where I arranged for a specific time to call and I called him because really when I wrote that letter nothing had happened yet.  I mean, that was - - when I wrote the initial letter, that was really before the State had even filed their motion for a jury trial.

So I tried to explain probably too much in a fairly brief period of time to him over the phone.  It was my understanding that he wanted to proceed forward.  However, when he came back to Tulsa, it was my - - I became aware, because of what he told me, that what he meant was is he wanted to proceed forward and continue to pursue an attempt at modification.  So I do believe after talking to him in person back in Tulsa that I misunderstood his statement to me.

Dkt. 13-13, at 51-52.  After this exchange, the state district court asked Southerland to clarify "the time line," and Southerland confirmed the following order of events:   "The [OCCA] decision, letter, phone call, and then the petition for rehearing."  *Id.* at 52-53.

On cross-examination, Southerland testified that he did not recall the specifics of his phone call with Kelley.  *Id.* at 53.  Southerland was "sure" that he would have introduced himself as the person who wrote Kelley the letter informing him of the OCCA's decision.  *Id.*  Southerland testified that while he was not aware of any "mechanism for dismissing the appeal at that point after a decision had been made" he nonetheless offered to seek dismissal, and Kelley responded by telling Southerland "that he wanted to proceed forward with the case."  *Id.* at 53-54.  The following colloquy then occurred between Young and Southerland:

Q.      I want to ask you about a very specific line you write in your affidavit at paragraph 15.  You say, "While [Kelley] preferred modification to resentencing, he did not want to dismiss the appeal at that time."  Where did you get that sense from your conversation with Mr. Kelley?

A.      Because we talked about modification and how that is what I requested and about my surprise that that's not the relief that we got.  And I'm sure he responded to that, Well, yeah, the modification is the way to go.  So he did approve of that sort of after the fact.  After I had already written the brief

19

and gotten the results, he after the fact approved of the modification request.

> Q.   So you had told him that the remedy that the [OCCA] was imposing was resentencing?

> A.   Right.  Right.  Because - - yes, I had sent - - the letter that I had sent to him referenced that and that's what we were talking about, yes.

> Q.   And he declined your offer to try to dismiss the appeal?

> A.   That was certainly my understanding.

Dkt. 13-13, at 54-55.  Southerland testified that before he spoke with Kelley on the phone, he knew that the State had requested a resentencing trial with a new jury.  *Id.* at 56.  Southerland reiterated that he did not "have specific recollection" of his phone conversation with Kelley but testified that he "certainly had to kind of explain to [Kelley] that some of the things in the letter, you know, that [Southerland] had discussed weren't really options anymore, that the State was moving forward with resentencing."  *Id.* at 56-57.  Southerland then testified about his in-person conversation with Kelley at the Tulsa County Jail:

> Q.   Did you discuss the State's intent in your conversation with [Kelley] when he arrived back at [the Tulsa County Jail]?

> A.   I did.

> Q.   How did he respond to this?

> A.   Well, he kept talking about modification.  I mean, I could tell when I talked to him that he thought that modification was still possibly an option when I had intended during the earlier phone call to tell him that that wasn't going to be an option at this point forward.  But he continued to talk about it and told me that he wanted the modification remedy.

Dkt. 13-13, at 57.  After Young asked a series of questions about Southerland's experience in explaining difficult concepts to defendants with cognitive limitations, Southerland testified:

> A.   . . .  And normally, when I sense that there is some kind of a problem like that, I think a personal face-to-face visit is the best way to handle that.

> Q.   Do you think you can do that in a phone call?

A.      I mean, I thought I could.  I believe I was mistaken.

Q.      I want to ask you a little bit about your role at the Tulsa County Public Defender's Office.  You are the chief deputy right now?

A.      First assistant.

        THE COURT:  Why do you think you are mistaken?  I don't want to assume that you mean one thing and you actually are trying to communicate something different.  You said you thought you could communicate that by phone and now you think you were mistaken.  Why?

        [SOUTHERLAND]:  Based on what [Kelley] told me when I talked to him face-to-face, because I had intended during that phone call basically to say, based on everything that had happened within days after the [OCCA] decision, that some of those options that I described in the letter were cut off.  But he still apparently thought when we talked in person that there was still an option of modification available.  So I don't think I conveyed that to him during the phone call as well as I should have.

. . .

Q.      (BY MR. YOUNG)  I actually want to explore that a little bit.  Your idea here is that he may have misunderstood the phone call?

A.      I believe so.

Q.      And that he continuously seems to be relating this to modification rather than resentencing?

A.      Yes.

Q.      Despite the fact that you sent him a letter saying that he was going to get resentencing, despite the fact that you spoke with him over the phone about resentencing?

A.      Yes.

Q.      What did you say to Mr. Kelley in the course of your conversation with him at [the Tulsa County Jail] that somehow made the light bulb finally turn on?

A.      I think by that time I had received a response on the petition for rehearing.  Part of the confusion probably came from my efforts to get the [OCCA] to go back to modification in the petition for rehearing.  So I was able to - - when I visited with him in the jail, I was able to more clearly explain, Look, I tried, I tried to do that, but I was unsuccessful and I think he finally got it.

Q.      So if you believe that he didn't understand what you were talking about over

21

the course of the letter and that phone conversation and it finally didn't click for him until you were at [the Tulsa County Jail], why didn't you include that in your affidavit?

A.      I tried to be complete, but I just - - I was simply relating my recollections in the affidavit.   It's probably not a complete recitation of absolutely everything that's happened in this case.

Dkt. 13-13, at 57-60.

Following the evidentiary hearing, the state district court made, and submitted to the

OCCA, the following findings of fact and conclusions of law:

> . . . Mr. Southerland failed to communicate with [Kelley] before filing the appeal. Accordingly, he failed to advise [Kelley] of the potential adverse consequences of successfully appealing.   Upon the OCCA's decision, Mr. Southerland wrote [Kelley] a letter outlining the potential adverse consequences of resentencing. Subsequently, he met with [Kelley] over the phone, discussing the letter, the details of his appeal, and again discussed the potential adverse consequences.   There, Mr. Southerland offered to dismiss the appeal, but [Kelley] declined Mr. Southerland's offer.   He met with [Kelley] again in Tulsa County at David L. Moss, where [Kelley] asked not to be resentenced.

> . . . Mr. Southerland failed to advise [Kelley], before filing, that the OCCA could deny his request for sentence modification on his sentencing error claim and instead order resentencing.

> . . . Mr. Southerland failed to advise [Kelley], before filing, that he could receive a life sentence if he appealed his 20-year conviction and prevailed only on his sentencing error claim.   It was not until after the OCCA's decision that Mr. Southerland first informed [Kelley] that he would be exposed to a life sentence.

> . . . Mr. Kelley would have accepted the risk of a longer sentence by submitting his sentencing error claim, had he been properly warned of his exposure to a longer sentence.

> . . . Mr. Southerland provided effective assistance of counsel.

Dkt. 12-11, at 9-10.   In October 2019, the OCCA rejected all four claims Kelley raised in his

resentencing appeal and affirmed his judgment and sentence.   Dkt. 12-14.

## V.      Federal habeas petition

Kelley, appearing without counsel, filed the Petition in December 2020, requesting federal

habeas relief as to three claims that he presented to the OCCA through his resentencing appeal:

Ground One:        Petitioner was deprived of effective assistance of counsel on appeal in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Ground Two:       The court erred in not limiting my sentence to 20 years[.]

Ground Three:     I should have been permitted to refuse the "relief" I was granted on appeal[.]

Dkt. 1, at 5, 7-8.[9] Kelley suggests that the appropriate habeas remedy as to each claim would be to order the state district court to vacate his life sentence and reinstate his original sentence of twenty years' imprisonment. *Id.* at 15. Respondent urges this Court to deny the Petition, asserting that 28 U.S.C. § 2254(d) bars relief as to ground one, that grounds two and three allege state law errors that are not cognizable on habeas review, and that even if ground two could be construed as alleging a federal due process claim, habeas relief is not warranted. Dkt. 12.

## DISCUSSION

A federal court may grant habeas relief to a state prisoner "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). However, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") and as interpreted by the United States Supreme Court, federal law tightly restricts a federal court's discretion to grant habeas relief to a state prisoner who claims his custody pursuant to State's criminal judgment violates federal law. *See Brown v. Davenport*, 596 U.S. 118,

---

[9] As previously noted, the Court must liberally construe the Petition because Kelley appears without counsel. *See supra* n.2. Kelley's claims are not well developed, and the Court has considered the arguments made in the counseled brief presented to the OCCA through Kelley's resentencing appeal (Dkt. 12-6) to better understand Kelley's claims.

125 (2022) ("Under AEDPA . . . a federal court may disturb a final state-court conviction only in narrow circumstances.").

As relevant here, 28 U.S.C. § 2254(d) limits a federal court's discretion to grant habeas relief when a prisoner's federal claims were "adjudicated on the merits in State court proceedings." A federal court "shall not" grant habeas relief as to a federal claim already rejected on the merits in state court unless the prisoner first demonstrates that the state court's adjudication of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[10] or "resulted in a decision that was based on an unreasonable determination of the facts" in light of the record presented in state court, 28 U.S.C. § 2254(d)(2).[11] *See also Shinn v. Kayer*, 592 U.S. 111, 112 (2020) (discussing § 2254(d) and explaining that "[w]hen a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement'" (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011))); *White v. Woodall*, 572 U.S. 415, 417

---

[10] As used in § 2254(d)(1), the phrase "clearly established federal law" refers only to holdings, not dicta, from Supreme Court decisions and refers only to those Supreme Court decisions that exist "as of the time the state court renders its decision." *Murphy v. Royal*, 875 F.3d 896, 913 (2017) (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)). Thus, the first step in reviewing a state court's decision under § 2254(d)(1) is "decid[ing] whether there is clearly established federal law that applies to the claim." *Id.*

[11] Before a federal court may grant habeas relief, a state prisoner also must show that he exhausted available state remedies, 28 U.S.C. § 2254(b)(1)(A), by "fairly present[ing] the substance of his federal habeas claim to state courts," *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002). And, in most cases, the prisoner must file a federal habeas petition within one year of the date on which the criminal judgment became final. *See* 28 U.S.C. § 2244(d)(1). Respondent concedes, and the Court finds, that Kelley timely filed the Petition and exhausted available state remedies as to all claims. Dkt. 12, at 3.

(2014) (referring to § 2254(d) as "a provision of law that some federal judges find too confining, but that all federal judges must obey").  The showings a state prisoner must make under § 2254(d) before a federal court may exercise its discretion to grant habeas relief are demanding because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal.'"  *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)).

Moreover, "habeas relief does not 'automatically issue if a prisoner satisfies the AEDPA standard.'"  *Murphy*, 875 F.3d at 914 (quoting *Horn v. Banks*, 536 U.S. 266, 272 (2002)).  Rather, if the prisoner satisfies § 2254(d)'s demanding standards, the federal court will consider the prisoner's federal claim de novo, without deference to the state court's decision.  *Id.*  And, if the federal court finds a constitutional error on de novo review, the federal court still must decide whether the prisoner has "show[n] that the error had a 'substantial and injurious effect or influence' on outcome of his trial."  *Davenport*, 596 U.S. at 126 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Regardless of whether a federal court reviews a state court's decision on a federal claim under § 2254(d) or reviews the federal claim de novo, the court must presume the correctness of any factual findings made by a state court unless the prisoner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(2); *Sumpter v. Kansas*, 61 F.4th 729, 750 (2023).

## I.   Ground one:  Ineffective assistance of appellate counsel claim

Kelley claims he was deprived of his rights, under the Sixth and Fourteenth Amendments to the United States Constitution, to the effective assistance of counsel on direct appeal.  Dkt. 1, at 5.  He contends Southerland "failed to advise [him] of the issues he intended to raise on appeal or the consequences of prevailing on appeal," and specifically failed to advise him that the OCCA

might remand his case for resentencing which could result in Kelley receiving a longer sentence. *Id.* Kelley alleges he "would not have agreed to raise [the sentencing-error claim] had [he] known of the risk of a life sentence if [he] won [his] appeal," and that Southerland "never mentioned the risk until after [his] appeal was decided." *Id.*

### A.     OCCA decision

Kelley presented this claim to the OCCA through his resentencing appeal. Citing *Strickland v. Washington*, 466 U.S. 668 (1984), Kelley argued (1) that Southerland performed deficiently by "failing to advise him of the potential adverse consequences of appealing his conviction and sentence," and (2) that this deficient performance resulted in prejudice because Kelley received a harsher sentence following his resentencing trial and, but for counsel's failure to advise him of the risks of resentencing, "Mr. Kelley would not have pursued [the sentencing-error] issue on appeal." Dkt. 12-6, at 9-14. Kelley also urged the OCCA to evaluate appellate counsel's performance by applying *Lafler v. Cooper*, 566 U.S. 156 (2012), and *Padilla v. Kentucky*, 559 U.S. 356 (2010)—two cases in which the Supreme Court applied *Strickland* to evaluate claims asserted by defendants who alleged their attorneys failed to adequately advise them about the consequences of pleading guilty. *Id.* at 12-14. Kelley argued, "Although the issue here is not a plea bargain, it is similar in that [he] was not properly advised of his right to forgo raising an issue on appeal that could, and did, result in a substantial injury." *Id.* at 14. Kelley further argued:

> Appellate counsel had a duty to inform, and properly advise, Mr. Kelley about the potential adverse ramifications of asserting certain issues on appeal, just as trial counsel has a duty to properly advise his client about the benefits and consequences of accepting or rejecting plea offers. Not only did counsel here fail to sufficiently advise his client – he failed to advise him entirely. It was not until after [the OCCA] granted relief that Mr. Kelley was instructed that he could receive a longer sentence at a second trial. Mr. Kelley should have been advised and allowed to make the decision regarding whether to appeal his original sentence. Appellate counsel's

failure to do so proved to be deficient performance.

*Id.* To establish prejudice, Kelley argued:

> [H]ad counsel adequately advised Mr. Kelley that he could receive a life sentence
> if he appealed his conviction and was resentenced, Mr. Kelley would not have
> pursued this issue on appeal. It was Mr. Kelley's understanding that because
> Appellate counsel sought relief in the form of a sentence modification, that [the
> OCCA] would not remand his case for resentencing.

*Id.* at 11.

Applying *Strickland*, the OCCA found it unnecessary to decide whether Southerland
performed deficiently and rejected Kelley's claim on the ground that he failed to establish
prejudice. Dkt. 12-14, at 4-10. The OCCA stated that Kelley had the burden "to affirmatively
prove prejudice resulting from his appellate attorney's actions" and that Kelley "must show that
there is a reasonable probability that, but for counsel's unprofessional error, the result of his appeal
would have been different." Dkt. 12-14, at 4. Giving "strong deference" to the state district
court's factual findings, the OCCA reasoned:

> The district court found appellate counsel's failure to advise Kelley either
> that the [OCCA] could elect a different remedy than that requested in the appellate
> brief, or that resentencing could result in a sentence greater than that originally
> imposed, did not fall below the objective standard of reasonableness imposed by
> the Sixth Amendment. The district court further found that Kelley failed to show
> the necessary prejudice because its review of the evidence showed Kelley would
> have accepted the risk of a longer sentence and would have elected to submit his
> sentencing error claim on appeal even had he been warned of the possibility of
> receiving a longer sentence.
>
> The record reveals the district court advised Kelley of his right to appeal at
> formal sentencing of his original trial and Kelley elected to exercise his right.
> Appellate counsel raised seven propositions of error. Six of the claims, if
> meritorious, would have resulted in a complete retrial, exposing Kelley, barring
> acquittal, to a life sentence and the risk a second jury would not be as lenient as his
> first. The remaining claim alleged an error relating to sentencing only. Had
> appellate counsel not also included the meritorious sentencing issue, a successful
> appeal would have left Kelley facing a minimum sentence on retrial of twenty years
> imprisonment instead of ten years imprisonment. Raising the sentencing error was
> therefore Kelley's only chance of facing a lesser range of punishment if his case
> was reversed and remanded based on one of the other errors alleged. On appeal,

[the OCCA] found merit in the sentencing error claim only and opted to remand Kelley's case for resentencing, his request for sentence modification notwithstanding. Faulting appellate counsel for raising a meritorious issue is certainly unusual. The record of the evidentiary hearing, however, uncovered that Kelley was neither advised of the claims raised on his behalf nor of the possible consequences of victory on any claim. Appellate counsel, by his own admission, thought the sentencing error claim was a winner and he considered the possibility of prevailing on the sentencing error claim only, structuring his prayer for relief accordingly to minimize Kelley's exposure. He understood that resentencing was not in Kelley's best interest. Appellate counsel was aware that [the OCCA] was not bound by his request for relief and that it could remand Kelley's case for resentencing. He was also aware that the [OCCA] had recently rejected an appellant's request for sentence modification in an unrelated case and instead ordered resentencing.

We need not dwell on whether appellate counsel's representation was deficient in this case because Kelley cannot show the necessary prejudice to prevail. Kelley must show the outcome of his appeal would have been different had appellate counsel advised him of the possible adverse consequences of appealing his original conviction and sentence. In other words, Kelley must show either that he would not have raised his sentencing error claim or appealed at all. Kelley was unable to convince the district court that he would have forgone his sentencing error claim on direct appeal.

Appellate counsel wrote Kelley a letter the day after he received the [OCCA's] opinion, remanding Kelley's case for resentencing. (State's Exhibit 1) Appellate counsel informed Kelley, via the letter, that he had been granted partial relief because of the improper use of one of his prior convictions for sentence enhancement. Appellate counsel further informed Kelley that "either the judge or the jury will be able to sentence you within a range of ten to life." He pointed out the risk of resentencing, noting specifically, "[a]s unfair as it sounds, you could get more than the twenty years that you already have been sentenced to." Shortly thereafter, Kelley spoke with appellate counsel by telephone. During this phone call, appellate counsel followed up on his letter and discussed the present posture of the case. He understood Kelley to approve, after the fact, of his decision to raise the sentencing error claim and to decline his offer to try to dismiss the appeal. Although appellate counsel proposed dismissing Kelley's successful appeal because of the risk of a longer sentence, Kelley said he wanted to proceed. The district court rejected Kelley's testimony disputing appellate counsel's recollection of his willingness to risk resentencing and dismissed appellate counsel's belief that he misunderstood Kelley's intentions about moving forward. The district court found the fact that Kelley wanted to move forward with resentencing, despite his exposure to a longer sentence, was proof he would have raised the sentencing error claim in his direct appeal even if appellate counsel had informed him of the risks of appeal.

The district court evaluated the credibility of the witnesses and the evidence

28

supports its finding that Kelley would have accepted the risk of resentencing had he been advised of the possible adverse consequences of appealing. Based on the record before us, Kelley has not shown the required prejudice to prevail. For that reason, we deny Kelley's ineffective assistance of appellate counsel claim.

Dkt. 12-14, at 6-10 (footnotes omitted).

### B.      Analysis and conclusion

Because the OCCA adjudicated the merits of Kelley's ineffective-assistance-of-appellate counsel claim, this Court cannot grant relief unless Kelley first shows that the OCCA's decision either (1) is contrary to clearly established federal law, (2) involved an unreasonable application of clearly established federal law, or (3) is based on an unreasonable determination of the facts that were presented in state court. 28 U.S.C. § 2254(d); *see, e.g.*, *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (explaining that "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner"). Kelley does not mention § 2254(d) or otherwise suggest that he can make any of these showings. Dkt. 1, generally. Respondent contends, and the Court agrees, that § 2254(d) bars relief.

### 1.      The OCCA's decision is not "contrary to" Supreme Court precedent.

Kelley cannot show that the OCCA's decision is contrary to clearly established federal law. "A state court decision is 'contrary to' the Supreme Court's clearly established precedent 'if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts.'" *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (alterations in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). In his resentencing appeal, Kelley aptly identified *Strickland* as providing the governing legal principles for evaluating his claim and asked the OCCA to apply *Strickland*. *See Honie v. Powell*, 58 F.4th 1173, 1193-94 (10th Cir. 2023) (identifying *Strickland* as clearly established federal law governing general ineffective-assistance-of-counsel claims).

29

*Strickland* requires a defendant to show (1) deficient performance, and (2) resulting prejudice. 466 U.S. at 688. *Strickland*'s two-part test applies to claims that appellate counsel provided constitutionally ineffective assistance. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (holding that *Strickland*'s "test applies to claims, like respondent's, that counsel was constitutionally ineffective for failing to file a notice of appeal"); *Smith v. Robbins*, 528 U.S. 259, 286 (2000) (identifying *Strickland*'s test as "the proper standard for evaluating [a state prisoner's] claim that appellate counsel was ineffective in neglecting to file a merits brief").

Under *Strickland*, a reviewing court's "scrutiny of counsel's performance must be highly deferential," and the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. Even if counsel's performance is shown to be unreasonable under this deferential standard, *Strickland* requires the defendant to establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. On habeas review, § 2254(d) adds a second layer of deference. A federal habeas court must grant the state court's decision evaluating the *Strickland* claim "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. "When a habeas petitioner alleges ineffective assistance of counsel, deference exists both in the underlying constitutional test (*Strickland*) and the AEDPA's standard for habeas relief, creating a 'doubly deferential judicial review.'" *Harris v. Sharp*, 941 F.3d 962, 973-74 (10th Cir. 2019) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Applying *Strickland*, the OCCA declined to decide whether appellate counsel performed deficiently because it determined that Kelley did not establish the requisite prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Because the OCCA applied *Strickland*, to reject Kelley's claim, the OCCA's decision is not contrary to Supreme Court precedent.

As previously discussed, Kelley also urged the OCCA to apply *Padilla* and *Lafler* to evaluate his claim.  Kelley does not mention either case (or *Strickland*) in his Petition.  Regardless, in both cases, the Supreme Court reaffirmed that *Strickland* is the clearly established federal law for evaluating a general claim that counsel provided constitutionally ineffective assistance.  *See Lafler*, 566 U.S. at 163 ("The question for this Court is how to apply *Strickland*'s prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial."); *Padilla*, 559 U.S. at 366-69 (concluding that that the defendant "sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland*" when his attorney "provided him false assurance that his conviction would not result in his removal from this country" and "[t]he consequences of [the defendant's] plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect").  And neither case clearly establishes that *Strickland*'s two-part test either does not apply or applies differently when, as here, a defendant claims appellate counsel failed to advise the defendant about potential adverse consequences of raising a sentencing-error claim on direct appeal.  *Lafler* held that a defendant who declined a plea offer based on plea counsel's concededly deficient performance, went to trial, and received a more severe sentence than he was offered through the rejected plea offer established *Strickland* prejudice by showing "that but for

31

counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea." *Lafler*, 566 U.S. at 174. *Padilla* held that a defendant who pleaded guilty after plea counsel failed to advise him that his plea made him subject to automatic deportation established deficient performance under *Strickland*. *Padilla*, 559 U.S. at 366-69. Here, Kelley alleges appellate counsel performed deficiently by failing to advise him about the risk of raising a sentencing-error claim on direct appeal that could result in resentencing and a longer sentence and that, but for counsel's deficient performance, Kelley either would have omitted that claim or would have chosen not to pursue a direct appeal. To the extent Kelley's arguments could be liberally construed as asserting that the OCCA's decision is contrary to *Lafler* or *Padilla*, the Court disagrees. Each case involved materially distinguishable facts, making it reasonable for the OCCA to reach a conclusion different from the conclusions the Supreme Court reached in those cases. In other words, because neither *Padilla* nor *Lafler* "addresses, even remotely, the specific question presented by this case," *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (*per curiam*), Kelley has not shown that the OCCA's decision is contrary to either *Padilla* or *Lafler*.

### 2.      The OCCA reasonably applied *Strickland* to the facts of this case.

Kelley offers no basis for this Court to conclude that the OCCA's decision involves an unreasonable application of *Strickland*. "A state court decision is an 'unreasonable application' of Supreme Court precedent if 'the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Frost*, 749 F.3d at 1223 (alteration in original) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 407 (2000)). "'Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule'—like the one adopted in *Strickland*—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Id.* (alteration in

original) (quoting *Richter*, 562 U.S. at 101).

In rejecting Kelley's claim, the OCCA found it unnecessary to determine whether appellate counsel performed deficiently because the OCCA determined, on the facts developed at the evidentiary hearing, that Kelley could not establish prejudice.[12]  This is an objectively reasonable application of *Strickland*'s guidance that courts may find it "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice."  466 U.S. at 697.  And it was objectively reasonable, under the facts of this case, for the OCCA to determine that Kelley did not establish the requisite prejudice.  Applying *Strickland*'s prejudice prong, the OCCA stated that "Kelley must show the outcome of his appeal would have been different had appellate counsel advised him of the possible adverse consequences of appealing his original conviction and sentence."  Dkt. 12-14, at 8.  And, without discussing *Lafler*, the OCCA applied a prejudice test like the one the Supreme Court applied in *Lafler* by stating that Kelley had to "show either that he would not have raised his sentencing error claim or appealed at all."  *Id.* at 8; *cf. Lafler*, 556 U.S. at 174  ("As to prejudice, respondent has shown that but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea."); *see also Honie*, 58 F.4th at 1189-92 (distinguishing between two applications of the *Strickland* prejudice standard—the substantive-outcome-based prejudice standard and the process-based prejudice standard—and

---

[12] While the OCCA stated that it need not decide whether Southerland's performance was deficient, the OCCA reasonably suggested it was.  The OCCA noted that "[b]est practices dictate that appellate counsel somehow advise a client of the appellate process, the likelihood of success on appeal, and the attendant risks associated with pressing any particular claim so the client can make an informed and intelligent decision whether or not to raise an issue or appeal at all."  Dkt. 12-14, at 7-8 & n.5 (citing ABA Standards for Criminal Justice, Defense Function 4-9.1(a), 4-9.2(c), 4-9.3(a) (2015)).  And, as the state district court found, "there was no meaningful communication relating to the potential adverse consequence of successfully appealing [Kelley's] conviction and sentence before" Southerland filed the appellate brief.  Dkt. 12-11, at 3-4.  Thus, regardless of whether the OCCA decided, or assumed without deciding, that Southerland performed deficiently, Kelley's claim necessarily hinged on whether he could show prejudice.

characterizing *Lafler* as applying the latter standard).  Giving deference to the state district court's factual findings and credibility assessments, the OCCA concluded that Kelley did not establish a reasonable probability that "he would have foregone his sentencing error claim on direct appeal." *Id.*  In its written findings of fact and conclusions of law, the state district court thoroughly discussed the testimony from the evidentiary hearing and concluded that Kelley's "argument, that he would have waived his sentencing error claim had he been properly warned of his exposure to a longer sentence, lacks credibility." Dkt. 12-11, at 7.  The state district court reasoned:

> The entire course of [Kelley's] post-decision litigation indicated a strong preference for sentence modification, while accepting the risk of a potentially greater sentence at resentencing.  [Kelley] was clearly informed of the risks associated with resentencing by way of Mr. Southerland's July 14, 2017 letter, and their phone conversation where [Kelley] declined Mr. Southerland's offer to dismiss the appeal. [Kelley's] argument is simply implausible.  He asks [the state district court] to believe that he was so aware of the dangers associated with resentencing that he asked for Mr. Southerland to dismiss the appeal, while seeking to explain away the myriad of evidence indicating otherwise by arguing that he was unaware of the risks until further counselled by Mr. Southerland at [the Tulsa County Jail].  Thus, [the state district court] finds that the only determination consistent with the evidence is that [Kelley] would have accepted the risk of a longer sentence, and submitted his sentencing error claim, had he been properly warned of his exposure to a longer sentence.

Dkt. 12-11, at 7.  And, as Respondent argues, the record developed in state court supports the state district court's finding, adopted by the OCCA, that Kelley would have accepted the risk of resentencing had Southerland timely and properly advised him of that risk before Southerland raised the sentencing-error claim on direct appeal.

Southerland's testimony established that he wrote Kelley a letter immediately after the OCCA remanded his case for resentencing, that he spoke to Kelley by phone after sending the letter, that he filed a petition for rehearing after he spoke with Kelley on the phone, and that he met with Kelley in-person after Kelley was transported to the Tulsa County Jail for his resentencing trial.  Dkt. 13-13, at 52-53, 57-59.  As the state courts reasoned, this sequence of

events was critical in assessing whether Kelley established a reasonable probability either that he would have omitted the sentencing-error claim, that he would have timely moved to dismiss the appeal, or that he would not have filed a direct appeal had Southerland timely and properly advised him of the potential adverse consequences of appealing his original sentence. In the letter, Southerland informed Kelley that because the OCCA remanded the case for resentencing, "either the judge or the jury will be able to sentence you within a range of ten to life" and Kelley could get a sentence exceeding his original twenty-year prison sentence. Dkt. 13-13, at 48, 104. During the subsequent phone call with Kelley, Southerland and Kelley discussed the risks of resentencing and Southerland asked Kelley "if he wanted to dismiss the appeal." Dkt. 12-7, at 6; Dkt. 13-13, at 37-40, 53-54.[13] Based on their telephone conversation, Southerland understood (1) that Kelley approved, albeit "after the fact," of Southerland's strategy to raise the sentencing-error claim and ask the OCCA to modify Kelley's sentence, (2) that Kelley did not want to dismiss the appeal, and (3) that Kelley "wanted to proceed forward with the case." Dkt. 13-13, at 52-55. Southerland's statements in his affidavit and in the petition for rehearing are consistent with Southerland's testimony from the evidentiary hearing on this point. Southerland stated in his affidavit:

> [Before filing the petition for rehearing,] I had contacted Mr. Kelley by telephone

---

[13] Southerland's offer to dismiss the already decided appeal was hollow, and Southerland admitted as much in his affidavit and at the evidentiary hearing. Dkt. 12-7, at 6 ("I did not know if that would be possible to dismiss the appeal given the fact that it was already decided, but I advised him that I would try if that was [what] he wanted."); Dkt. 13-13, at 54 ("I was aware of no mechanism for dismissing the appeal at that point after a decision had been made."). The OCCA confirmed this in its decision rejecting Kelley's resentencing appeal. *See* Dkt. 12-14, at 17 (noting that "[t]he parties agree there is no mechanism to dismiss an appeal once it has been decided by [the OCCA]," and explaining that "[i]f a criminal defendant avails himself of the appellate process, [the OCCA's] decision is binding once decided and will not be recalled absent a finding the [OCCA] that the appeal was improvidently decided"). Nonetheless, the fact that Kelley declined Southerland's offer to dismiss his appeal and told Southerland he wanted to continue seeking a modified sentence further supports the state courts' conclusion that Kelley would have proceeded with his direct appeal and would have raised his sentencing-error claim had Southerland timely and properly advised him of the risk of a longer sentence.

and asked him if he wanted to dismiss his appeal.  I did not know if that would be possible to dismiss the appeal given the fact that it was already decided, but I advised him that I would try if that was want [sic] he wanted, given my warning in the July 14, 2017 letter.  *While he preferred modification to resentencing, he did not want to dismiss his appeal at that time.*

Dkt. 12-7, at 6 (emphasis added).  In the petition for rehearing that Southerland filed after speaking

with Kelley on the phone, Southerland again asked the OCCA to modify Kelley's sentence and, in

the conclusion paragraph of the petition for rehearing, Southerland stated:

[Kelley] is not asking for [the OCCA] to dismiss this appeal.  Mr. Kelley has expressed to the undersigned his willingness to take the risk of a life sentence as long as he has the ability to argue to a second jury for a term shorter than the 20-year sentence he has already received.

Dkt. 12-4, at 1, at 9.  At Kelley's evidentiary hearing, Kelley denied telling Southerland that he

was willing to risk a life sentence so long as he could argue at the resentencing trial for a sentence

less than twenty years and suggested that Southerland misunderstood him.  Dkt. 13-13, at 33.

Southerland testified that he recalled making this statement in the petition for rehearing but

testified that he must have misunderstood Kelley's statements about moving forward with the case

and not seeking dismissal.  Dkt. 13-13, at 51-52.  The state district court discredited both witnesses'

testimony regarding the alleged misunderstanding.  The state district court noted that "Southerland

is a highly-experienced defense attorney who is experienced in effectively communicating with

defendants who may be cognitively limited."  Dkt. 12-11, at 7.  The state district court also

discredited Kelley's testimony that he "absolutely" asked Southerland to dismiss the appeal, that

he did not really understand anything about his direct appeal, and that he would not have accepted

the risk of resentencing if properly advised of that risk before the appeal was filed.  Dkt. 13-13, at

73.  In evaluating Kelley's credibility, the state district court noted that Kelley testified at the

evidentiary hearing "like he is kind of an uninterested observer and he listened to the phone call

but he couldn't hear, and it was about his liberty and about his freedom and his appeal, but it was

noisy in the hall and he wasn't really listening." *Id.* The state district court noted the stark contrast between Kelley's demeanor at the evidentiary hearing and at his original trial, citing the state district court's recall of its observations that Kelley expressed keen interest and understanding at his original trial and regularly informed his trial counsel that "there was discovery that was not done").

Kelley does not make any discernible argument in the Petition that the OCCA unreasonably applied *Strickland*'s prejudice prong to the facts of his case. Regardless, having carefully reviewed the well-developed state court record, this Court concludes that Kelley has not met his burden of persuading this Court that that no fairminded jurist could reach same conclusion as the OCCA regarding Kelley's failure to establish *Strickland* prejudice. *See Davenport*, 596 U.S. at 135 (explaining that "§ 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable" and "[t]o accomplish that, a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents").

### 3.   The OCCA reasonably determined the facts.

Kelley has not shown that the OCCA's decision is based on an unreasonable determination of the facts presented in state court. Under § 2254(d)(2), a habeas petitioner "must show that the state court's adjudication of the claim 'resulted in a decision that was *based on* an unreasonable determination of the facts in light of the evidence presented.'" *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)). "The standard for determining whether the state court's decision was based on an unreasonable determination of the facts "is a restrictive one." *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) (quoting *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013)). "[A] factual finding may be

unreasonable under § 2254(d)(2) only if the state court 'plainly misapprehended or misstated the record' and the 'misapprehension goes to a material factual issue that is central to the petitioner's claim.'" *Id.* (quoting *Menzies v. Powell*, 52 F.4th 1178, 1195 (10th Cir. 2022)).  And "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

As just discussed, the OCCA based its decision on facts thoroughly developed through an evidentiary hearing.  Kelley does not identify any specific facts that the OCCA either misstated or misapprehended in reaching its conclusion that he did not establish *Strickland* prejudice.  *See* Dkt. 1, at 5 ("I would not have agreed to raise the issue had I known the risk of a life sentence if I won my appeal.  My attorney never mentioned the risk until after my appeal was decided."); *Meek v. Martin*, 74 F.4th 1223, 1251 (10th Cir. 2023) ("The burden of showing that the state court's factual findings are objectively unreasonable falls squarely on the petitioner's shoulders.").  Having carefully reviewed record of state court proceedings, the Court finds that the OCCA's decision is based on a reasonable determination of the facts presented in state court.

### 4.       § 2254(d) bars relief as to ground one.

Based on the foregoing analysis, the Court concludes that § 2254(d) bars relief as to Kelley's ineffective-assistance-of-appellate-counsel claim.  The Court therefore denies the Petition as to ground one.

## II.     Ground two:  Due process claim

In ground two, Kelley contends the resentencing court erred in not limiting his sentence to twenty years.  Dkt. 1, at 7.  In support, Kelley states "[t]he [OCCA] could not increase [his] sentence by modification.  The court should not have allowed a jury to do what the appellate court could not and permit a jury to increase [his] sentence from 20 years to life." *Id*.  When he presented

this claim to the OCCA, Kelley framed it as a jury instruction error that deprived him of his Fourteenth Amendment right to due process, and the OCCA applied federal law to conclude that no due process violation occurred.  Dkt. 12-6, at 15; Dkt. 12-14, at 10-16.  Although Kelley does not clearly reassert his Fourteenth Amendment claim in the Petition, *see* Dkt. 1, at 7, the Court generously construes ground two as presenting the same due process claim Kelley presented to the OCCA.[14]

### A.      OCCA decision

In his counseled brief, Kelley argued the resentencing court abused its discretion when it refused his request to instruct the jury that the appropriate range of punishment was ten years to twenty years in prison.  Dkt. 12-6, at 15.  Discussing state law, Kelley recognized that the OCCA has statutory authority to order resentencing but argued that "[b]ecause appellate counsel asked for sentence modification, the [resentencing] court should have instructed the jury that the maximum range of punishment was 20 years."  *Id.*  Turning to federal law, Kelley acknowledged "that neither the double jeopardy provision nor the Equal Protection Clause of the Constitution impose an absolute bar to a more severe sentence assessed by a jury upon reconviction at a second trial."  *Id.* at 18.  But he distinguished his case, arguing it "is unlike most resentencing cases in that his original conviction was affirmed."  *Id.*  On this point, Kelley relied, in part, on *North Carolina v. Pearce*, 395 U.S. 711 (1969), for the proposition that the Constitution does not necessarily

---

[14] Respondent urges the Court to deny relief as to ground two for two reasons.  First, Respondent characterizes this claim as one alleging jury instruction error on a matter of state law that is not cognizable on habeas review.  Dkt. 12, at 38-47.  Second, Respondent contends the alleged error in refusing to instruct the jury on a limited range of punishment did not result in fundamental unfairness.  *Id.*  Because Kelley articulated a Fourteenth Amendment claim in his counseled appellate brief, the OCCA adjudicated that claim by applying federal law, and Respondent discusses federal law in the Response, this Court rejects Respondent's argument that ground two alleges only an error of state law.

preclude a harsher sentence upon reconviction at a second trial but argued that under the facts of his case, "the so-called 'clean slate' doctrine should not apply, and the jury should be allowed to sentence to a term of years only within the proper range of punishment not to exceed his original sentence." *Id.* at 19-21.

The OCCA noted that Kelley requested a jury instruction limiting the range of punishment to a term between the minimum sentence he could receive with one prior felony conviction (ten years' imprisonment) and the sentence the original jury recommended and the trial court imposed (twenty years' imprisonment). Dkt. 12-14, at 10. The OCCA further noted that the "district court rejected Kelley's argument that due process and fundamental fairness compelled that his original jury's sentence act as the punishment cap for resentencing." *Id.* at 10-11. The OCCA concluded the district court's rejection of that claim was not an abuse of discretion because the law does not support Kelley's position. *Id.* at 11-16. The OCCA first described Kelley's arguments:

> Kelley puts a novel twist on the "clean slate" doctrine to support his claim. The well-established "clean slate" doctrine rests on the premise that once the defendant's original conviction has been wholly nullified at his behest, the slate is wiped clean, retrial is not barred by double jeopardy, and the defendant is subject to the full range of punishment. According to Kelley, when [the OCCA] remands a case solely for resentencing, the second jury, out of fairness, should not be allowed to resentence the defendant in excess of the original jury's verdict. He maintains the "clean slate" doctrine should not apply to him and those similarly situated because the underlying conviction has been affirmed and the original jury's sentencing decision deserves deference because that jury decided the level of the defendant's culpability. Because his original jury imposed the minimum sentence of twenty years under its instructions, Kelley argues that its verdict made clear that he was undeserving of the maximum sentence and its decision should enjoy some binding effect. In other words, his second jury should have been constrained by his original jury's intentions since that jury decided the facts of the underlying offense. The only justification for not capping the maximum sentence, he contends, is to punish a defendant for appealing. He asks [the OCCA] to remedy this alleged due process violation by remanding his case for a new sentencing proceeding with the range of punishment capped at twenty years imprisonment.

Dkt. 12-14, at 11-12 (footnote omitted). Applying federal law, the OCCA then evaluated those arguments, stating,

In *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S. Ct. 2072, 2080, 23 L. Ed. 2d 656 (1969), the Supreme Court held that vindictiveness against the accused for having successfully overturned his conviction must play no part in the sentence he or she receives after a new trial.  In order to assure the absence of vindictive motivation, the Court concluded that whenever a *judge* imposes a more severe sentence upon a defendant after a new trial, the reasons underlying the judge's sentencing decision must affirmatively appear.  *Id.* at 726, 89 S. Ct. at 2081 (emphasis added).  Otherwise the presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by "'objective information . . . justifying the increased sentence.'"  *Texas v. McCullough*, 475 U.S. 134, 142, 106 S. Ct. 976, 981, 89 L. Ed. 2d 104 (1986) (quoting *United States v. Goodwin*, 457 U.S. 368, 374, 102 S. Ct. 2485, 2489, 73 L. Ed. 2d 74 (1982)).  The Supreme Court has since made clear that the *Pearce* presumption of vindictiveness does not apply in every case in which a defendant receives a higher sentence on retrial.  *E.g. Alabama v. Smith*, 490 U.S. 794, 802-03, 109 S. Ct. 2201, 2206-07, 104 L. Ed. 2d 865 (1989) (holding no presumption of vindictiveness arose where sentence imposed after trial was greater than sentence imposed after guilty plea that defendant succeeded in vacating); *Chaffin v. Stynchcombe*, 412 U.S. 17, 26-28, 93 S. Ct. 1977, 1982-83, 36 L. Ed. 2d 714 (1973) (holding no presumption of vindictiveness arose when second jury on retrial following successful appeal imposed a higher sentence than a prior jury).  The evil that *Pearce* sought to rectify was eliminating vindictiveness in the retrial process rather than preventing the imposition of an increased sentence on retrial, since valid reasons associated with the need for discretion in the sentencing process exist. *Smith*, 490 U.S. at 799, 109 S. Ct. at 2204-05.  Where there is no reasonable likelihood the increase in punishment was the result of vindictiveness, the burden remains with the defendant to prove actual vindictiveness.  *Id.* at 799-800, 109 S. Ct. at 2205.

Kelley cites no authority holding the "clean slate" doctrine operates differently at a resentencing trial versus a complete retrial.  Nor does he offer any authority holding that a defendant should not, or is not, subject to the full range of punishment provided by law at a resentencing proceeding.  *See Chaffin*, 412 U.S. at 25, 93 S. Ct. at 1982 (recognizing the possibility of a higher sentence has been accepted as a legitimate concomitant of the retrial process).  Even though *Chaffin* is a complete retrial case, it is particularly instructive.  Chaffin successfully appealed his original conviction and jury sentence of fifteen years.  *Id.* at 18-19, 93 S. Ct. at 1978-79.  At his retrial, the jury again returned a guilty verdict and fixed punishment at life imprisonment.  *Id.* at 19-20, 93 S. Ct. at 1979.  Chaffin argued on appeal that it was improper and unfair for the State to allow the second jury to render a harsher sentence on retrial.  The Supreme Court rejected his arguments and held:

> Guided by the precedents of this Court, these are the conclusions we reach.  The rendition of a higher sentence by a jury upon retrial does not violate the Double Jeopardy Clause.  Nor does such a sentence offend the Due Process Clause so long as the jury is

not informed of the prior sentence and the second sentence is not otherwise shown to be a product of vindictiveness. The choice occasioned by the possibility of a harsher sentence, even in the case in which the choice may in fact be 'difficult,' does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction.

*Id.* at 35, 93 S. Ct. at 1987.

The record shows that Kelley's jury at his resentencing trial was unaware of the original sentence meted out by his former jury. Kelley's resentencing jury was also not informed that he had successfully appealed and won a new sentencing trial. The district court instructed the jury on the applicable range of punishment under Section 51.1, and the jury fixed punishment within the range provided without any evidence of vindictiveness appearing in the record. Based on the reasoning in *Chaffin*, Kelley has neither established a violation of due process, nor has he shown the district court abused its discretion in refusing his range of punishment instruction. Accordingly, we find the district court did not err in refusing to cap Kelley's punishment range at twenty years imprisonment. This claim is denied.

Dkt. 12-14, at 12-16.

**B.    Analysis and conclusion**

Because the OCCA adjudicated the merits of Kelley's due process claim, this Court cannot grant relief unless Kelley first shows that the OCCA's decision either (1) is contrary to clearly established federal law, (2) involved an unreasonable application of clearly established federal law, or (3) is based on an unreasonable determination of the facts that were presented in state court. 28 U.S.C. § 2254(d); *see, e.g.*, *Visciotti*, 537 U.S. at 25 (explaining that the habeas petitioner has the "burden to show that the state court applied [clearly established federal law] to the facts of his case in an objectively unreasonable manner"). Again, Kelley does not mention § 2254(d) or suggest that he can make any of these showings. Dkt. 1, generally. For the following reasons, the Court finds that § 2254(d) bars relief as to ground two.

**1.    The OCCA's decision is not "contrary to" Supreme Court precedent.**

Kelley cannot show that the OCCA's decision is contrary to clearly established federal law.

As previously stated, "[a] state court decision is 'contrary to' the Supreme Court's clearly established precedent 'if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts.'" *Frost*, 749 F.3d at 1223 (alterations in original) (quoting *Cone*, 535 U.S. at 694).

Because Kelley framed his due process claim as based on the state district court's refusal to give a requested jury instruction, the first level of clearly established law provides that "[u]nless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." *Tiger v. Workman*, 445 F.3d 1265, 1267 (citing *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). In his resentencing appeal, Kelley relied, in part, on *Pearce* to provide the second level of clearly established law supporting his position that "the so-called 'clean slate' doctrine should not apply, and the jury should be allowed to sentence to a term of years only within the proper range of punishment not to exceed his original sentence." Dkt. 12-6, at 19-20.

But, as the OCCA determined, *Chaffin* appears to provide the more specific legal principles governing Kelley's claim. The question presented in *Chaffin* was "whether, in those States that entrust the sentencing responsibility to the jury, the Due Process Clause of the Fourteenth Amendment bars the jury from rendering higher sentences on retrials following reversals of prior convictions." *Chaffin*, 412 U.S. at 18. The *Chaffin* Court "reaffirm[ed] the underlying rationale of *Pearce* that vindictiveness against the accused for having successfully overturned his conviction has no place in the resentencing process, whether by judge or jury," but held "that due process of law does not require extension of *Pearce*-type restrictions to jury sentencing." *Id.* As the OCCA reasoned, the facts in *Chaffin* are materially indistinguishable from the facts in the instant case. In

*Chaffin*, a Georgia jury found the defendant guilty of robbery by open force or violence, which was then a capital offense. *Id.* at 18. The jury was instructed it could impose a sentence of death, life imprisonment, or a term of years. *Id.* The jury imposed a fifteen-year prison term. *Id.* The Georgia Supreme Court affirmed the defendant's conviction and sentence on direct appeal, but the defendant sought and obtained federal habeas relief, resulting in a return to state court for a retrial. *Id.* at 19. A retrial was held before a different judge and a new jury, the new jury found defendant guilty, the new jury received the same instruction regarding punishment options, and the new jury imposed a life sentence. *Id.* at 19-20. The Georgia Supreme Court rejected the defendant's argument "that it was improper for the State to allow the jury to render a harsher sentence on retrial"; the federal district court rejected the defendant's request for habeas relief, holding that the higher sentence "was not violative of due process"; and the Supreme Court granted certiorari to resolve a circuit split on that issue. *Id.* at 20-21. The *Chaffin* Court stated that the defendant

> assert[ed] three distinct due process claims: (A) higher sentences on retrial violate the double jeopardy provision of the Fifth Amendment . . .; (B) higher sentences occasioned by vindictiveness on the part of the sentencing authority violate traditional concepts of fairness in the criminal process; and (C) the possibility of a higher sentence, even absent a reasonable fear of vindictiveness, has an impermissible 'chilling effect' on the exercise of the rights to appeal and to attack collaterally a conviction.

*Id.* at 22-23. The *Chaffin* Court rejected all three claims.

Relying on *Pearce* and *Stroud v. United States*, 251 U.S. 15 (1919), the *Chaffin* Court reaffirmed the premise on which the clean-slate doctrine rests—namely that when a defendant has succeeded in nullifying his or her conviction and receives a harsher sentence on retrial, there is no double jeopardy violation. *Id.* at 23-24. As to the second claim, the *Chaffin* Court reasoned that *Pearce* "was premised on the hazard of vindictiveness" and that "[t]he potential for such abuse of the sentencing process by the jury is . . . de minimis in a properly controlled retrial." *Id.* at 25-26. The *Chaffin* Court further stated that "where improper and prejudicial information regarding the

prior sentence is withheld, there is no basis for holding that jury resentencing poses any real threat of vindictiveness." *Id.* at 28 (footnote omitted).  Lastly, as to the defendant's claim that permitting a new jury to impose a harsher sentence on retrial would have a potential "chilling effect" on the decision to exercise the right to appeal or collaterally attack a conviction, the *Chaffin* Court found "no foundation" in *Pearce* to support that claim.  *Id.* at 29.  Relying on Supreme Court decisions addressing hard choices criminal defendants face in navigating the criminal justice system, the *Chaffin* Court concluded that the defendant "was not himself 'chilled' in the exercise of his right to appeal by the possibility of a higher sentence on retrial and [the Supreme Court] doubt[ed] that the 'chill factor' will often be a deterrent of any significance." *Id.* at 29-33.  The *Chaffin* Court thus concluded that "[t]he choice occasioned by the possibility of a harsher sentence . . . does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction."  *Id.* at 35.

Because the OCCA applied *Pearce* and *Chaffin* to evaluate Kelley's claim that it was fundamentally unfair, i.e., violative of due process, to permit the resentencing jury to impose a higher sentence than the original jury, Kelley cannot show that the OCCA's decision is contrary to clearly established federal law.

### 2.     The OCCA reasonably applied *Chaffin* to the facts of this case.

Kelley also has not shown that the OCCA's decision involves an unreasonable application of either *Pearce* or *Chaffin*.  As previously stated, "[a] state court decision is an 'unreasonable application' of Supreme Court precedent if 'the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Frost*, 749 F.3d at 1223 (quoting *Terry Williams*, 529 U.S. at 407).

Kelley's due process claim is not well defined, either in his counseled appellate brief or in

his Petition.  As the OCCA described it, Kelley's argument recognized that the double jeopardy clause generally does not bar a harsher sentence on retrial because the slate has been wiped clean, but Kelley's argument also asserted that the clean-slate doctrine should apply differently when a defendant succeeds only in overturning a sentence, not a conviction, and thus obtains a retrial solely on the issue of punishment.  Dkt. 12-14, at 11-12.  Based on this understanding of Kelley's claim, the OCCA reasonably applied *Chaffin* when it stated that neither *Chaffin* nor any other authority holds that the clean-slate doctrine "operates differently at a resentencing trial versus a complete trial."  *Id.* at 14.  Further, the OCCA reasonably applied *Chaffin* to the facts of this case when it determined there was no evidence that the longer sentence Kelley received on resentencing resulted from vindictiveness.  The OCCA reasoned:

> The record shows that Kelley's jury at his resentencing trial was unaware of the original sentence meted out by his former jury.  Kelley's resentencing jury was also not informed that he had successfully appealed and won a new sentencing trial.  The district court instructed the jury on the applicable range of punishment under Section 51.1, and the jury fixed punishment within the range provided without any evidence of vindictiveness appearing in the record.  Based on the reasoning in *Chaffin*, Kelley has neither established a violation of due process, nor has he shown the district court abused its discretion in refusing his range of punishment instruction.  Accordingly, we find the district court did not err in refusing to cap Kelley's punishment range at twenty years imprisonment.

*Id.* at 11-16.  As the OCCA stated, there is no evidence in the record suggesting vindictiveness on the part of the resentencing jury.  This was an objectively reasonable application of *Chaffin*.  *See Chaffin*, 412 U.S. at 28 ("[W]here improper and prejudicial information regarding the prior sentence is withheld, there is no basis for holding that jury resentencing poses any real threat of vindictiveness.").  On the record presented, Kelley has not persuaded this Court that no fairminded jurist could reach the same conclusion as the OCCA regarding Kelley's due process claim.

**3.     The OCCA reasonably determined the facts.**

Kelley has not shown that the OCCA's decision is based on an unreasonable determination

of the facts presented in state court.  As previously stated, to satisfy § 2254(d)(2), a habeas petitioner "must show that the state court's adjudication of the claim 'resulted in a decision that was *based on* an unreasonable determination of the facts in light of the evidence presented.'"  *Byrd*, 645 F.3d at 1172 (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)).  The facts relevant to Kelley's due process claim are few:  (1) the state district court denied Kelley's request for an instruction limiting the sentencing range to between ten and twenty years; (2) no information was presented to the resentencing jury regarding Kelley's original sentence or his successful sentencing-error claim; and (3) the jury was instructed on the punishment range provided by Oklahoma law.  Dkt. 12-14, at 10, 15-16.  Kelley does not identify any specific facts that the OCCA either misstated or misapprehended in reaching its conclusion that Kelley failed to establish a due process violation arising from either the state district court's refusal to give an instruction limiting the maximum punishment to his original sentence of twenty years' imprisonment or the resentencing jury's imposition of a life sentence following his resentencing trial.  Dkt. 1, generally.  Having independently reviewed the record, the Court finds nothing therein to suggest that the OCCA decision as to the due process claim is based on an unreasonable determination of the facts presented in state court.

#### 4.       § 2254(d) bars relief as to ground two.

Based on the foregoing analysis, the Court concludes that § 2254(d) bars relief as to Kelley's due process claim.  The Court therefore denies the Petition as to ground two.

### III.    Ground three:  Appellate remedy claim

In ground three, Kelley contends "[he] should have been permitted to refuse the 'relief' [he] was granted on appeal."  Dkt. 1, at 8.  In support of this claim, Kelley states:  "The jury in my first trial was improperly instructed.  The [OCCA] agreed, but did not grant the requested relief of

modification.  I should have been permitted to decline the 'relief' imposed on me (resentencing)." *Id.*  When Kelley presented this claim to the OCCA through his resentencing appeal, he argued that the trial court abused its discretion when it overruled his objection to proceeding with resentencing.  Dkt. 12-6, at 21-23.  Kelley acknowledged that "there is no mechanism to dismiss an appeal after it has been decided," but argued that he "should have been allowed to reject the 'relief' from [the OCCA], just as he is allowed to reject review of his case on appeal." *Id.* at 22.  Kelley also argued the State "invited the error" that resulted in the OCCA's decision to remand the case for resentencing and that the State should not have been allowed to receive "the benefit of a greater sentence." *Id.* at 23.

Respondent contends, and the Court agrees, that Kelley's third claim raises only an issue of state law by questioning whether the state district court abused its discretion on remand by proceeding with a resentencing trial as directed by the OCCA rather than allowing Kelley to "refuse" resentencing.  Dkt. 12, at 51; *see* Okla. Stat. tit. 22, § 1066 (authorizing appellate court to, *inter alia*, "order a new trial or resentencing").  Kelley did not rely on any federal law when he presented this claim to the OCCA.  Dkt. 12-6, at 16-18.  And the OCCA relied solely on state law to reject this claim.  Dkt. 12-14, at 16-17.  The OCCA reasoned that its decision on direct appeal "ordering resentencing was binding on the parties" and that Kelley "provides no authority allowing a district court to ignore a directive from an appellate court." *Id.*  Even generously construing the Petition and relying on Kelley's counseled appellate brief to better understand Kelley's third claim, the Court reasonably construes this claim as asserting an alleged error of state law that is not subject to habeas review.  *See Corcoran*, 562 U.S. at 5 (2010) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  The Court therefore denies the Petition

as to ground three.

## CONCLUSION

Because the OCCA's adjudication of the federal claims Kelley asserts in grounds one and two did not result in a decision that is contrary to clearly established federal law, that involved an unreasonable application of clearly established federal law, or that is based on an unreasonable determination of the facts presented in state court, 28 U.S.C. § 2254(d) bars relief as to grounds one and two. Because Kelley's third ground for relief alleges only a state-law error, it does not present a claim that is cognizable on habeas review. For these reasons, the Court denies Kelley's Petition. The Court further concludes that reasonable jurists would not debate the correctness of this Court's assessment of the constitutional claims raised in grounds one or two or its determination that the claim asserted in ground three alleges only an error of state law. The Court therefore declines to issue a certificate of appealability. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of Carrie Bridges, Warden, in place of Rick Whitten as party Respondent.

2. The Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Dkt. 1) is **denied**.

3. A certificate of appealability is **denied**.

4. A separate judgment shall be entered in this matter.

**DATED** this 27th day of February, 2024.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE